THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES GREER, JR., Defendant-Appellant.

(No. 72-32; 

Fifth District—August 20, 1973.

*Rehearing denied October 12, 1973.*

JONES, J., dissenting.

Linda West Conley, of Defender Project, of Chicago, for appellant.

Robert H. Rice, State's Attorney, of Belleville, (Philip G. Feder, Assistant State's Attorney, of counsel,) for the People.

Mr. PRESIDING JUSTICE EBERSPACHER delivered the opinion of the court:

The defendant, James Greer, Jr., has brought this appeal from a judgment entered upon his conviction for the offense of murder by the Circuit Court of St. Clair County. The case was tried before a jury. Upon conviction the defendant was sentenced to the penitentiary for a term of from 14 to 45 years.

During the early morning hours of September 22, 1969, the events of this case began to unfold. A female, Yvonne Davis, was having a drink at a lounge in East St. Louis and the defendant came into the lounge and joined with Yvonne Davis in having a drink. The two of them decided to leave the premises and pick up Theresa Dowell, who was a mutual friend and the eventual decedent and victim of the murder.

The defendant and Yvonne Davis left in the defendant's mother's car, a then new 1969 model, picked up Mrs. Dowell and went to the We Three Lounge also located in East St. Louis. At the We Three Lounge Yvonne Davis and the defendant went in and had a couple of drinks, bringing Mrs. Dowell's drinks to her out in the car because Mrs. Dowell was not dressed appropriately to enter the establishment. After about 30 or 40 minutes, the trio, who had been friends for more than a year, left the We Three Lounge and drove to the B & F Lounge, also located in East St. Louis. The time of arrival was at 1:00 A.M. or shortly thereafter. The B & F was not crowded, there being only three other people in the place when the threesome arrived. The lounge contained a Mr. Ben J. Roby, the manager, Clentis Hickman, a patron, and Ailene Stevens, a barmaid. All three in addition to Miss Davis were called as State's witnesses.

The B & F Lounge is located on the south side of State Street in East St. Louis. When the three walked into the bar, they sat at the south end of the bar. The defendant sat next to Mrs. Dowell, with Yvonne Davis sitting next to Mrs. Dowell. The defendant sat facing Mrs. Dowell while Yvonne Davis was talking with Clentis Hickman. Ailene Stevens, the barmaid, was behind the bar. Ben Roby was sitting at the other end of the bar, but had left and was across the room at the stereo; the music was playing.

The evidence is uncontradicted that the decedent had a gun in her purse, a gun the property of defendant which she had pawned and recovered and that there was discussion between defendant and decedent about the gun which defendant wanted. The defendant had turned on the bar stool as had the decedent so that the two were facing with Mrs.

Dowell's legs between the defendant's knees and her back toward Miss Davis who was in turn facing toward Hickman. Defendant and decedent had been keeping company with each other for more than a year; they had no argument that evening and were not arguing or raising their voices; no one saw any signs of violence between them. All witnesses heard what they thought was a shot where defendant and decedent were seated. No witness saw the shooting except the defendant who stated that decedent accidently shot herself with it, and that he never touched the gun. No witness testified that he did although Miss Davis testified that decedent said "she had been shot" and that after decedent had walked around the end of the bar and collapsed defendant arose with a gun in his hand but did not know which hand.

None of the other State's witnesses ever saw the gun and the gun was not presented at the trial nor was inquiry made concerning its disposition; the others all testified that they did not at any time see defendant have a gun. Miss Davis took charge of decedent's purse and admittedly removed some of its contents, which she gave to decedent's husband, before eventually delivering a purse to the prosecution which was admitted into evidence on the basis of Miss Davis testifying it was the purse Mrs. Dowell had there that evening. Defendant testified that it was not the purse decedent had and that defendant believed she either had the gun back in the purse or was putting it back in when it was fired. No one else testified it was the purse decedent had there that evening. No one contradicts that it was in her lap and would have been inches from where the bullet entered her body whether fired at close proximity by defendant or by decedent; it apparently showed no powder burns, or bullet hole. Her testimony as to what was said or done immediately after the shooting was contradicted by other State's witnesses. All five gathered around decedent when she collapsed, most were agreed that she stated "I have been shot." She testified that defendant at the time made a threatening remark to her which caused her to flee to the bathroom, but she did not know what those remarks were.

She testified that after decedent had been taken out and placed in defendant's car, by defendant and Roby, to take decedent to a hospital, that defendant returned hammered on the bathroom door and shouted "Come on out, you are next." None of the other witnesses supported this but testified that defendant came back in, paid for the drinks, went to the bathroom door, tapped on it and told her to come on. They denied that he hammered, shouted or made threats against her. Upon defendant's driving away she came out of the bathroom, telephoned defendant's mother and a lady friend asking the latter to send a taxi for her which

she did. She then went to the lady friend's home where she remained the rest of the night without further inquiry or report concerning her friend, Mrs. Dowell. No one at any time called an ambulance or reported the incident to the police.

Roby testified decedent said, "He shot me" when she arose and went toward the end of the bar, but when asked, still on direct, to whom she said that, answered, "Well, she didn't say who—she said, just said 'I was shot' I don't know." He proceeded to testify then that while the witnesses were gathered around decedent he asked defendant "Did you shoot her?" and that defendant answered "I am trying to kill her." When admonished to speak louder he testified, "Exactly I don't know exactly how he said what he said I don't know exactly, but he was talking he said 'I am going to kill her' I am going to do something, I don't know the exact words he used." The prosecutor by a question then suggested that defendant had said "I am going to kill her, I am going to shoot her, is that what he said?" to which the witness answered, "He threatened her things like that, words like that." He then testified, "I said Let's get her to the hospital, you shot her" and that he then "caught hold of her. I was trying to help him get out, I didn't see where she was shot. I thought she might have fainted or she got scared or something. I said, Will you take her to the hospital, he said, Yes I will take her to the hospital."

On cross examination he admitted testifying in St. Louis a short time after the incident "I asked what happened—did he shoot her and someone said yes." He admitted that he never saw a gun and that in answer to the question "Did you hear James make any statement after the shooting" in a previous hearing, he testified "No, he said this is my thing, something like that. I don't know if he said it is his wife or his woman, I don't know what he said" and admitted that in the previous hearing in St. Louis, he had never in response to the request to testify to what happened, testified to any threats by defendant to decedent and concluded that "He was saying a lot of things; I don't remember exactly what that was" and stated specifically that he never did see defendant with a gun.

Apparently attempting to anticipate defendant's testimony the prosecutor on redirect then asked whether the witness ever heard defendant say "I didn't mean to shoot her; please call the ambulance; please call the police" to which the witness answered "No." There is nothing in the record from which it could even be inferred that defendant ever said "I didn't mean to shoot her."

On direct examination the barmaid Ailene Stevens testified that Roby asked defendant "Did you shoot her" and defendant answered "yes"

admitting that after the woman collapsed she was so excited that she did not know what was said, on cross examination. On cross she admitted testifying previously that Roby asked "Did he shoot her" and she then testified "I was so upset—I think he said yes."

None of the other witnesses heard the incriminating statements to which Roby had testified although all were right there together.

When Hickman, the patron who was present, testified as to what was said immediately after the incident the prosecutor attempted to manufacture evidence to support his opening statement that defendant said "Let her lie there and die." After testifying that defendant started around to decedent when she had fallen he stated that defendant said "Leave her lie there." The witness thought the decedent was just playing although he had heard what he thought was a shot. He did not indicate whether defendant's statement was made out of compassion or disgust. He testified then that when Roby came up defendant said, "Help me put her in my car; I will carry her to the hospital." Then after testimony as to what occurred after the decedent had been taken to the car, the prosecutor asked the witness,

"Now, how far away were you from Mr. Greer when he said, Let her lie there and die?"

Counsel immediately objected that that was not what the witness had said. The court agreed "No he didn't." The prosecutor said "I am sorry" and defense counsel asked that the remarks of the State's Attorney be stricken. The court ruled "Stricken. I think the jury heard what the witness said." Subsequently the prosecutor returned to the matter by inquiry of the distance between the witness and defendant, "When he said let her lie there or something like that?" The witness ignored the question and answered, "He said 'let her lie there.' "

■■ Standing as a single incident, the errors in conduct of the State's Attorney in attempting to impress the jury with the callousness of the defendant by leading them to believe that defendant had said "Let her lie there and die" when there was absolutely no evidence that defendant ever made that statement, but only evidence that he said "Let her lie there", would have been cured by the court's remark and ruling as well as the impressive correction by the witness of the prosecutor. However, the incident is here recited as one that displayed a calculated attempt to give credence to the false statement in the opening statement, and to prejudice the jury and deprive the defendant of the fair trial which the prosecutor was obligated by law to afford him.

Defendant here contends that he was prejudiced by the prosecutor's opening argument coupled with the questioning of the witness, Hickman, with reference to what defendant said immediately after the decedent

had collapsed. He told the jury that there would be testimony to the effect that,

"Greer said 'Let her die. I shot her.' "

No witness ever testified that defendant said "Let her die," nor that defendant said "I shot her."

Defendant also pointed out that in the opening statement the prosecutor told the jury, "the next morning the police apprehended the defendant, Mr. Greer" and that the evidence is uncontroverted that defendant voluntarily went to the police station and surrendered himself.

In the rebuttal argument the prosecutor told the jury:

"Well, if he is acquitted he is going to be back on the street. The State has one opportunity to try someone. We don't have the right of appeal; this is our one and only opportunity."

Defense counsel promptly objected, asked that a juror be withdrawn and a mistrial declared. The court, "overruled" and the prosecutor concluded his argument. In the argument of defense counsel we find nothing that invited those remarks made in rebuttal.

We particularly note the last three sentences and the fact that by overruling the objection the court placed his sanction upon them. There is no question that error was committed by the prosecutor and by the trial court, who should have sustained the objection, ordered the remarks stricken and instructed the jury to disregard them in the interest of providing defendant a fair trial. At the least it was a subtle attempt to infer to the jury that if there was doubt in their minds of defendant's guilt they should convict because the State had only one opportunity and no right to appeal. While the statement did not specifically state that any mistake the jury made could be corrected because defendant could appeal, it inferred as much. The inferences were magnified and given credence by the action of the trial judge. In 23A C.J.S., Criminal Law § 1101, it is pointed out that it is improper to point out that the State has no right to appeal, although it may not warrant reversal. In a case in which there is or may be reasonable doubt, because of the sufficiency or clarity of the evidence, of the defendant's guilt, and there is a likelihood that the remark was calculated to and did or may have had an influence upon the jury against the defendant, such argument sanctioned by the court constitutes a ground for setting aside the conviction, particularly when it is coupled with other conduct of the prosecutor indicating an indifference to defendant's right to a fair trial.

■■ Defendant was not entitled to a perfect trial, but he was entitled to a fair one. From a careful reading of the entire record, we have determined that the evidence is extremely close and whether reasonable men would have found defendant guilty of the murder with which he

was charged, had he been given a fair trial, is open to question. We therefore arrive at the conclusion that defendant is entitled to a new trial.

Reversed and remanded.

G. MORAN, J., concurs.

Mr. JUSTICE JONES dissenting:

I respectfully dissent.

Although it was error for the prosecutor to attribute a statement to defendant ("Let her lie there and die") which he did not in fact make, under the circumstances in which the matter was presented and handled in this case it did not, in my opinion, influence or sway the jury and therefore did not prejudice defendant or prevent him from receiving a fair trial. When witness Hickman was asked by the prosecutor "Now, how far away were you from Mr. Greer, when he said, 'Let her lie there and die?'" the defendant's objection was sustained and the court stated that the witness had not so testified. Later the witness testified on two occasions during his direct examination that defendant had said "Let her lie there." When the prosecutor later asked witness Hickman how far away he was when he heard defendant say "Let her lie there or something like that," this can by no means be construed as an attempt to rephrase the offensive question; it was a legitimate attempt to establish the distance between the witness and defendant to show that he was within easy hearing distance.

The prosecutor commenced his opening statement by saying:

"Now, before I start this opening statement once again I would like to advise you to please listen to what the witnesses say. If you cannot hear what they say please let us know, so that you will have all the evidence.

As I said when I talked to you before the trial began, what they say is the evidence, not what I say in this instance here or during the course of the trial or what Mr. Hoban may say. If I say something now in opening statement and later you find out in evidence it happened or didn't happen, then you will take that evidence in making your decision."

Repeating the admonition, the prosecutor prefaced his closing argument with this language:

"The purpose of the State in closing argument is to inform you as to the facts—as to what we believe the State has proven. If, during my argument to you I should state something you don't believe happened, you use your own recollection in recalling to mind what the witnesses said.

Again I want to caution you that what the witnesses say is the evidence, not anything I may say during the closing argument or anything Mr. Hoban may say; just what the witnesses have testified to.'

Furthermore, at least four different times during the closing argument the prosecutor stated that witness Hickman had testified that defendant said only "Let her lay there." In view of the correction of the testimony attributed to defendant by the prosecutor by both the court and the witness, and the repeated admonitions to the jury that they were to take the evidence only as given by the witnesses and the statement by the prosecutor on four different occasions in his closing argument that the witness had said "Let her lay there," it is inconceivable that the jury could be misled or influenced in any degree by the remark of the prosecutor in his opening statement and the inference carried by his question, or that the defendant would be prejudiced in any way from receiving a fair trial because of the appearance of the offensive remark and question during the trial.

I also do not believe that prejudice resulted to defendant because the prosecutor remarked in his closing argument that the State did not have a right to appeal. The remark was improper and the trial court was in error in overruling defendant's objection. However, in view of what I view as strong evidence of defendant's guilt this remark should not constitute reversible error. This is conceded by the majority in their opinion and the holding of the cases referred to in the C.J.S. citation.

Although a prosecutor's remarks may be subject to criticism, unless they constitute a material factor in the conviction or are such that prejudice to the defendant is the probable result, the verdict will not be disturbed (*People v. Davis*, 46 Ill.2d 554, 264 N.E.2d 140; *People v. Nicholls*, 42 Ill.2d 91, 245 N.E.2d 771.) This rule was followed by this District in *People v. Lyons*, 8 Ill.App.3d 695, 290 N.E.2d 313. In my opinion the remarks of the prosecutor cannot be said to constitute a material factor in the conviction of the defendant and accordingly are not reversible error.